# UNITED GAS IMPROVEMENT CO. v. SECURITIES AND EXCHANGE COMMISSION.
## Nos. 7888, 8046.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 6, 1942.
Decided Nov. 17, 1943.

Thomas B. K. Ringe and William Clarke Mason, both of Philadelphia, Pa. (A. Allen Woodruff, Garfield Scott, Henry C. Place, and Morgan, Lewis & Bockius, all of Philadelphia, Pa., on the brief), for petitioner.

Homer Kripke and Herbert B. Cohn, both of Philadelphia, Pa. (John F. Davis, Sol., Roger S. Foster, Counsel, Public Utilities Division, and Maurice C. Kaplan, William R. Nowlin, and Seymour Kleinman, all

of Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, MARIS, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

The petitioner, The United Gas Improvement Company, has filed two petitions with this court pursuant to the provisions of Section 24(a) of the Public Utility Holding Act of 1935, 15 U.S.C.A. § 79x(a), seeking to have us set aside two orders of the Securities and Exchange Commission requiring UGI, pursuant to the provisions of Section 11(b) (1) of the Public Utility Act of 1935, 15 U.S.C.A. § 79k(b) (1), to divest itself of certain interests.

UGI registered under Section 5 of the Act, 15 U.S.C.A. § 79e, and thus became "a registered holding company" within the meaning of Section 11(b) (1) of the Act, 15 U.S.C.A. § 79k(b) (1). Section 11(b) (1) provides that it shall be the duty of the Commission as soon as practicable after January 1, 1938, to require by order, after notice and opportunity for hearing, every registered holding company to take such action as the Commission shall find necessary to limit the operations of the holding company to a single integrated public-utility system and to such other businesses which are reasonably incidental or economically necessary or appropriate to the operations of such an integrated public-utility system. The section provides further, however, that

the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems if it finds that the conditions specified in subparagraphs (A), (B) and (C) prevail in respect to it or them. The conditions imposed by these paragraphs require a showing (A) that such additional systems cannot be operated as independent systems without the loss of substantial economies; (B) that the additional systems are located in one State or in adjoining States; and (C) that the continued combination of such systems under the control of the holding company is not so large as to impair the advantages of localized management, efficient operation or the effectiveness of regulation. The section also provides that the Commission may permit as reasonably incidental or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of interests in other businesses (other than public utilities) which the Commission shall find necessary or appropriate in the public interest, or for the protection of investors or consumers and not detrimental to the proper function of such system or systems.[1]

No question has been raised by UGI in the proceedings before us as to sufficiency of notice or the propriety of the purely procedural steps taken by the Commission. At every stage of the proceedings before the Commission, however, UGI has asserted

---

[1] The provisions of Section 11(b) (1) are as follows:

"(b) It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system: Provided, however, That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems, if, after notice and opportunity for hearing, it finds that—

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial econo-

mies which can be secured by the retention of control by such holding company of such system;

"(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

"(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation.

The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

as a matter of substance, as it now asserts before us, that the Commission has proceeded by its orders of divestiture to effect a piecemeal dismemberment of the UGI system without determining the single integrated public-utility system or additional systems to which UGI may be entitled under Section 11(b) (1). As a corollary to this proposition UGI asserts also that the Commission has required it to divest itself of companies which are "non-utility operated businesses" within the definition contained in Section 2(a) (5) of the Act, 15 U.S.C.A. § 79b(a) (5), as well as of various "investments" without determining the single integrated public-utility system or additional systems to which it may be entitled. UGI contends further that, assuming that the Commission is not under a duty to determine first what constitutes UGI's single integrated public-utility system and additional systems, the orders made by the Commission are not required by the national public interest and that the retention of the interests ordered divested does not and cannot affect interstate commerce; that the Commission has no power to compel UGI to divest itself of "non-utility operated businesses", except after certain findings by the Commission which have not been made by it; that the Commission has failed to make basic findings necessary to support the ultimate facts as found by it and has also failed to make the ultimate findings of fact necessary to support its orders; that the Commission has failed to give adequate consideration to contentions of UGI as to its interest in certain companies; and last, that the provisions of Section 11(b) (1) and the orders of the Commission entered thereunder violate the Constitution of the United States.

Before dealing with these contentions, it is necessary to state certain relevant facts. The UGI system is a large one. UGI has control of, or the interest prescribed by Section 2(a) (7),[2] 15 U.S.C.A. 79b(a) (7), in, a number of holding companies. See, also, Section 2(a) (8), 15 U.S.C.A. 79b(a) (8). UGI controls through these holding companies, or itself controls directly, a

number of "public-utility companies" (using that phrase as defined by Section 2(a) (5) of the Act, 15 U.S.C.A. § 79b(a) (5) and non-statutory public utility companies. UGI also has interests in companies which are not public utility companies either statutory or non-statutory.

The nature of UGI's interests in the companies comprising its system at the time the orders here under review were entered may be summed up briefly as follows: (1) It owned 12.3% of the stock of Midland United Company, a holding company, which in turn owned 45.22% of the stock of Midland Utilities Company, Midland United Company and Midland Utilities Company in turn owned or controlled some forty companies most of which are statutory public-utility corporations, operating in the middle west, principally in and about the State of Indiana. Midland United Company and its subsidiaries, which were included in the original notice of the Commission (Document No. 1), were dismissed as parties by later orders of the Commission. Neither Midland nor its subsidiaries are affected by the orders complained of. (2) UGI owned also 97.3% of the stock of Philadelphia Electric Company which in turn controlled approximately twenty statutory public utility and other companies operating in Pennsylvania, New Jersey and Delaware. No interest of UGI in Philadelphia Electric Company or its subsidiaries is affected by the orders complained of. (3) UGI also had interests in approximately twenty-eight other companies, many of which are statutory public utility companies operating in Pennsylvania, Delaware, New Jersey and Connecticut. UGI's interests in a number of these companies (viz., in Concord Gas Company, Manchester Gas Company, The Wyandotte County Gas Company, Nashville Gas and Heating Company, New Haven Gas Light Company, The Hartford Gas Company, The Bridgeport Gas Light Company, and Connecticut Railway and Lighting Company) were required to be divested by the Commission's order of May 7, 1942.[3] UGI by this order is also required to divest itself of its interest in The Ari-

---

[2] Section 2(a) (7) of the Act provides inter alia: " 'Holding company' means—(A) any company which directly or indirectly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company * * *."

[3] The Commission has already issued a rule upon UGI to show cause why it should

not divest itself of another one of the companies referred to, viz., Luzerne County Gas and Electric Corporation, which operates in Luzerne County, Pennsylvania. An answer has been filed by UGI in response to this order and some hearings have been had but the proceeding stands suspended temporarily.

zona Power Company, a subsidiary of Commonwealth Utilities Corporation, referred to in (5) infra. (4) UGI owned also 28.5% of the stock of Public Service Corporation of New Jersey, a holding company, which in turn owned or controlled the stock of some fifteen companies, a number of which are statutory public utility companies. The interests of UGI in these companies are not affected by the orders complained of. Proceedings have been pending before the Commission to determine the status of Public Service Corporation of New Jersey which has sought exemption by the Commission pursuant to Section 3(a) (1) of the Act, 15 U.S.C.A. § 79c(a) (1). (5) UGI also owned 99.9% of the stock of Commonwealth Utilities Corporation, the holding company referred to in (3) supra, which in turn owned or controlled the stocks of ten subsidiary companies; viz., The Arizona Power Corporation, Arizona Ice and Cold Storage Company, Crystal Ice & Cold Storage Company, Home Ice Company, Galveston Ice & Cold Storage Company, Merchants Ice & Cold Storage Company, Crystal Ice Company, National Ice & Cold Storage Company, New State Ice Company, St. Louis County Water Company, Springfield Ice and Refrigerating Company. Only one of these, The Arizona Power Corporation, is a statutory public utility. The Commission by its order of July 30, 1941, directed UGI to divest itself of any direct or indirect ownership, control, or holding of securities in Commonwealth Utilities Corporation and in its subsidiaries named above except The Arizona Power Corporation, the latter company, as we have indicated, being included in the order of divestiture of May 7, 1942.

Some of the subsidiaries affected by the two orders of divestiture are electric utility companies. Some are gas utilities. The service areas of the electric utility subsidiaries are in Connecticut, New Jersey, Pennsylvania, Delaware, Maryland and Arizona. The service areas of the gas utility subsidiaries are in New Hampshire, Connecticut, Pennsylvania, Delaware, Tennessee and Arizona.

The total assets of UGI as shown by its consolidated balance sheet of December 31, 1939, amounted to $837,504,000, and the net corporate income in that year was $26,636,-000.[4] In its findings and opinion (Document No. 81) the Commission stated, inter alia, "There are two principal groups of subsidiaries in the system which operate gas and electric properties. One group is located in Pennsylvania, Maryland and Delaware, and the other in Connecticut. An examination of the balance sheets and income statements shows that the great majority of the system's assets is invested in these two areas. The combined property accounts of consolidated subsidiaries shows that as of December 31, 1939, those operating in southeastern Pennsylvania, Delaware, and Maryland aggregated approximately $467,275,000, and those in Connecticut aggregated approximately $113,042,000. Disregarding any excess of carrying value over book value of the subsidiaries' securities owned, the properties of companies in these two areas amounted to some $580,317,000, whereas the total consolidated property account was reported as approximately $626,-000,000 as at December 31, 1939." It is obvious that UGI's single integrated public utility system, whether it be composed solely of electric utility properties or will include gas utility properties as well, lies in the three-state area; that is to say, in southeastern Pennsylvania, northern Delaware and northeastern Maryland, to which must be added a small portion of southern New Jersey if Deepwater Light and Power Company and Deepwater Operating Company, both of which are located in New Jersey on the eastern bank of the Delaware River, close to New Castle and Wilmington, Delaware, are included.[5] We will assume that the Commission and UGI when they refer to the three-state system mean to include the two last-named companies. The electric and gas generating transmission and distribution facilities of UGI in

---

4 See House Report No. 827, Part 3, 73rd Congress, 2nd Session, pp. 886–914, for additional information relating to the UGI system.

5 The Commission in its opinion (Document 81, note 5) in that portion of the proceedings subject to review at our No. 7888, stated in respect to the single integrated system as follows: "This system would be made up of the electric facilities owned or operated by Philadelphia Electric Company, Chester County Light and Power Company, Delaware Light and Power Company, Philadelphia Hydro-Electric Company, Philadelphia Electric Power Company, The Susquehanna Power Company, The Susquehanna Electric Company, Conowingo Power Company, Southern Pennsylvania Power Company, Deepwater Light and Power Company and Deepwater Operating Company."

the Pennsylvania-Delaware-Maryland region serve a territory approximately 2,400 square miles in area which contains a population of at least 3,000,000 people. An examination of the very extensive record in the case at bar leads inevitably to the conclusion that the single integrated public utility system of UGI, whether it includes gas utilities[6] or not, must lie in this area and can lie in no other.

In its opinion the Commission stated under the heading "The Issues Presented" that "Respondents agree that the integrated electric utility system operating in the three state area (Pennsylvania, Delaware, and Maryland) as described in the staff's report and in our Tentative Conclusions,[7] is at least a part of the primary [single] system contemplated by Section 11(b) (1), and further agree that this primary system is confined to these three states. Although we are not here directly concerned with establishing the limits of the principal system or systems in this area, the position taken by respondents in this respect has enabled the Commission and the respondents to simplify the issues considered in this Opinion as well as the scope of the proof to be offered in subsequent stages of the proceeding. Respondents have specifically conceded that the properties which are under consideration at this time are not a part of the single integrated [electric-utility] system or systems in the three state area."

■ At page 33 of its brief, the Commission makes the following statement, "We concede that it may be necessary to identify the principal system, or at least make alternative assumptions with respect thereto, as a point of reference in determining the retainability of additional systems and other businesses * * *. For the same purpose it may also be necessary under some circumstances first to determine with some particularity the limits of the single integrated system because of the logical relevance of that issue to the questions relating to the retainability of an additional system or other business in question. No such situation is presented here. UGI does not suggest that any evidence might become relevant to the retainability of any property involved in the present proceeding if it knew the exact confines of its principal system; nor can we conceive of any such evidence. Thus UGI completely fails to show prejudice in the entry of the divestment orders at this stage, and imposes on this Court when it vaguely asserts prejudice to the presentation of its case by virtue of the procedure adopted by the Commission." UGI, however, as we have stated, has urged at every stage of the proceedings that the Commission is without power under Section 11(b) (1) to compel UGI to divest itself of any interest in any company until it has determined what UGI's single and additional systems consist of; for otherwise, runs the argument, the Commission cannot determine what businesses are reasonably incidental or economically necessary or appropriate to the operations of such systems. There is logic in this assertion when viewed nudum against the Act without reference to the particular circumstances which led the Commission to make the orders complained of. But when we examine the record in the reviews at bar and the concessions which UGI has made[8] the logic of its assertion disappears. We can perceive readily that there may be circumstances in which the determination of a holding company's single integrated public utility system or additional systems is the primary necessity. Clearly, however, such circumstances are not presented by the cases at bar.

■ Directing our attention specifically to the proceedings subject to review at our No. 7888, we state that UGI seeks to set aside the order of the Commission entered July 30, 1941, requiring UGI to divest itself

---

[6] The Commission has rendered a tentative opinion in the proceedings holding that the provisions of Section 2(a) (29) of the Act, 15 U.S.C.A. § 79b(a) (29), prevent gas utilities and electric utilities from being included in the same integrated public utility system, though indicating the gas utility and electric utility properties may be incorporated in additional integrated public utility systems controlled by a single holding company.

[7] The Commission is referring to a report made to it by its staff and certain "Tentative Conclusions" (Document No.

48) by it relating to the UGI system in its proceedings now under review at our No. 8046.

[8] UGI has conceded that the Pennsylvania-Delaware-Maryland locality is the area of its single integrated system, saying, "It is the limits of that where we seem to be at issue." See p. 574a. UGI has never asserted that the subsidiary companies named in the order of May 7, 1942, might be included in an additional integrated system or systems. Indeed its whole position avows the contrary.

of direct or indirect ownership and control in securities issued by the companies designated in this opinion in (5) supra. But pending the proceedings for review of the order complained of, UGI caused Commonwealth Utilities Corporation to sell to its, UGI's, own top holding corporation, The United Corporation, all interests that Commonwealth had in all of Commonwealth's subsidiaries named in the order. Commonwealth, in fact, owned or controlled all the companies named except two; Welsbach Company and Camden County Land Company. UGI itself owns the controlling interest in Welsbach Company which in turn owns all of the stock of Camden County Land Company. The Commission accordingly dismissed its proceedings[9] as to all the companies included in its divestiture order of July 30, 1941, except Commonwealth Utilities Corporation, Welsbach Company and Camden County Land Company. All questions raised by this review in respect to UGI's interests in Commonwealth's subsidiaries, except The Arizona Power Corporation, have therefore become moot.

■ Commonwealth has retained Arizona Power as its sole subsidiary and this company carries on a statutory public utility business in Arizona. It further appears from the record that no later than May 6, 1941, the terms of a contract providing for the sale of Arizona Power's physical property[10], had already been agreed to and that the contract was awaiting the signature of a prospective purchaser. Furthermore, the Commission by its order of May 7, 1942, has required UGI to divest itself of any interest in Arizona Power for reasons which are found to be valid hereinafter. When this divestiture has taken place Commonwealth will stand without subsidiaries. Indeed, it appears from the record that Commonwealth's dissolution has been contemplated. It is obvious therefore that UGI's interest in Commonwealth is not reasonably incidental, economically necessary or appropriate to the operations of any integrated public utility system to which UGI may be entitled under the Act.

■ Welsbach Company, which was at one time engaged in the manufacture of Welsbach mantles, now exists solely as a holding company for the stock of Camden County Land Company which owned lands and riparian rights along the Delaware River at Camden, New Jersey. The petitioner states in its brief, p. 69, that Camden County Land Company's property has been taken under condemnation proceedings by the United States Government for war purposes. It is inconceivable therefore that Welsbach Company and Camden County Land Company could constitute businesses reasonably incidental, economically necessary or appropriate to the operations of any single integrated public utility system or of any additional system or systems permitted to UGI by Section 11(b) (1).

Aside from certain contentions of the petitioner which are equally applicable to both orders and which we will discuss at a later point in this opinion, we think that what we have said disposes of the questions raised by the petitioner in respect to the order of July 30, 1941.

■ By the order of May 7, 1942, subject to our review at No. 8046, the Commission required UGI to divest itself of its direct or indirect ownership and control in the nine companies designated in (3) supra, including The Arizona Power Company. Statements made by counsel for UGI and by its officers make it plain that UGI does not contend that its interests in the nine companies may be retained by it as a part of its single integrated systems or indeed as part of any additional integrated system or systems which may be allowed to UGI.[11] None of these companies can be considered (as the record demonstrates and as the Commission found) as elements in any integrated system which might be al-

---

[9] See Holding Company Act Release No. 3455, dated April 21, 1942.

[10] President Bodine of UGI, when asked what was the purpose of the continued corporate existence of Commonwealth, stated, "I think I will have to answer that question indirectly by saying that I don't know you could get rid of the corporate existence of Commonwealth Utilities, because although we have paid off all its existing debt there is a substantial amount of preferred stock outstanding and no place for the cash to come from to pay off the preferred other than through the sale of assets, that is, stocks of subsidiary companies." See pp. 633a.

In view of the fact that all of the subsidiaries of Commonwealth have been disposed of except Arizona Power, the physical assets of which are about to become subject to a contract of sale, the continued corporate existence of Commonwealth seems futile whether or not there are sufficient assets to pay stockholders in full.

[11] See pp. 472a–473a; p. 502a.

lowed to UGI, and since they are statutory public utilities, they may not be considered to be "other businesses" incidental, or economically necessary or appropriate to any integrated system of UGI.

■ UGI has raised certain additional questions, however, in respect to its interests in The Hartford Gas Company, New Haven Gas Light Company and Connecticut Railway and Lighting Company. UGI's interests in Hartford Gas and New Haven Gas Light are held by it through a subsidiary, Connecticut Gas and Coke Securities Company. UGI has contracts to indemnify Koppers Company of Delaware, an unaffiliated company, for a period of twenty-five years beginning October 1, 1926, for any payments made by it under an agreement entered into by Koppers to guarantee dividends on the preferred stock of Connecticut Gas and Coke Securities Company. UGI also has guaranteed the interest on certain bonds of Connecticut Railway and Lighting Company maturing on January 1, 1951. UGI takes the position " * * * that no order should be issued with respect to those companies until it has first been determined how, if at all, those contractual obligations may be removed prior to 1951 * * *."; and asserts that these questions must be solved in any proposed order of divestiture. The gravamen of UGI's complaint is that it is being divested of earnings of companies by being deprived of its interests therein while retaining obligations in respect to those companies. But the Commission is concerned only with the status of these companies under the standards imposed by Section 11(b) (1). The points raised by UGI in this connection are immaterial to the issues presented on this review for the three companies are statutory public utility companies and unless they may be included in some integrated public utility system allowable to UGI, interests in them may not be retained by UGI. The fact that UGI has obligations in respect to them is a fact which may not be considered by the Commission in view of the mandate imposed upon the Commission by the statute.

UGI also contends that the Commission was without power to compel it to divest itself of its interests in The Bridgeport Gas Light Company and in The Wyandotte County Gas Company because these interests constitute "investments". UGI's "investments" consist of securities held by it for investment purposes in businesses not operated by its holding company system. As we have indicated, only two of UGI's interests are involved on this point.[12] The Bridgeport Gas Light Company, a gas utility in Connecticut, has been found by the Commission not to be a subsidiary of UGI.[13] UGI owns approximately 11% of the common stock of Bridgeport Gas and 33% of the first preferred stock and 100% of the second preferred stock of Wyandotte County Gas. The preferred stocks do not carry voting rights and Wyandotte County Gas is therefore not a statutory subsidiary of UGI. UGI's interests in both companies therefore seem to lie within its definition of "investments".

■ The Commission found that the question of whether UGI might be able to retain such interests was to be determined by the other businesses clause of Section 11(b) (1). The words of the statute need not be repeated here. It is enough to state that UGI has not shown that either Bridgeport Gas or Wyandotte County Gas are reasonably incidental or economically necessary or appropriate to any integrated public utility system which may be allowed to it. But UGI makes the contention that no power was conferred upon the Commission to compel divestiture of any interest which a holding company may have in a statutory public utility which it does not operate; that is to say, which is not a subsidiary of the holding company. UGI contends that significant words lie in the first sentence of Section 11(b) (1) which provides that the Commission shall take such action as may be appropriate " * * * to limit the *operations* of the holding-company system * * *". If an investment in a company is not such an interest as will permit the holding company to operate the company of which the interest is held, then, says

---

[12] By reason of defaults in dividends only the preferred stock of Manchester Gas Company is entitled to vote. UGI's interest in Manchester represents only 9.3% of the voting power. In a proceeding instituted under Section 2(a) (8) (B), Manchester was declared to be a subsidiary of UGI. See 7 S.E.C. 57 (1940).

[13] See The Bridgeport Gas Light Company, 8 S.E.C. 295 (1940). The proceeding was instituted pursuant to Section 2 (a) (8) of the Act, 15 U.S.C.A. § 79b(a) (8).

UGI, the Commission has no power to limit the holding company system by compelling the holding company to divest itself of its interest or investment in such a company. UGI takes the position that the stated purposes of the Act as contained in Section 1 (a), 15 U.S.C.A. § 79a(a), and the abuses sought to be corrected as set out in Section 1(b), 15 U.S.C.A. § 79a(b), demonstrate that it was the intention of Congress to so limit the power of the Commission.

■ While control by a holding company of a subsidiary generally connotes management or at least some measure of supervision, this is not always the case. It is always true, however, that the functioning of a holding company includes the holding of stocks of other companies. In every case the "operations" of a holding company consist largely of holding stocks. The word "operation" in its commonest usage means simply the " * * * act, process, or effect of operations"[14] and there is nothing in the Act or in its history which would lead us to conclude that Congress intended another or different meaning for this word. See Boston Sand & G. Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170. The effect of the operations of a public utility holding company is the holding of stocks of operating public utility companies whether that holding is sufficient to bring the company whose stock is held into the category of a subsidiary under Section 2(a) (8), 15 U.S.C.A. § 79b(a) (8), or an affiliate under Section 2(a) (11), 15 U.S.C.A. § 79b(a) (11). We think that Congress did not intend the strained construction which UGI seeks to put upon the statute. The obvious intention of Congress in enacting Section 11(b) (1) was to integrate public utility holding company systems and to compel holding companies subject to the Act to relinquish interests in unrelated utilities as well as unrelated non-utility companies. The myriad, promiscuous activities and investments of some of the holding company systems was a prime cause of investors' losses.

■ That the jurisdiction of the Commission to limit holding company systems goes as far as we have indicated is made plain by an examination of Section 11(a), 15 U.S.C.A. § 79k(a), of the last sentence of Section 11(b) (1) and of Sections 9(a) and 10, 15 U.S.C.A. §§ 79i(a) and 79j. Congress intended the Commission to assume the duty of examining the character of the "interests" of every registered holding company. See Section 11(a). The last sentence of Section 11(b) (1) states the conditions under which certain of these interests (other than public utility companies as such) may be retained by the holding company. Section 9(a) provides that a registered holding company may not acquire in the future "any securities or utility assets or any other interest in any business * * *" unless that acquisition is approved by the Commission as provided in Section 10. The word "interests" surely is broad enough to embrace situations in which a holding company may own stock in a company which is less than control. Congress has given the Commission the power to compel registered holding companies to divest themselves of interests held by them prior to the effective date of the Act. It has also given to the Commission the authority to prevent registered holding companies from acquiring like interests in the future.

We will proceed now to deal with certain contentions of the petitioner which go to the propriety of both orders made by the Commission.

■ Citing Section 1(c) of the Act, 15 U.S.C.A. § 79a(c),[15] UGI takes the position that the retention of the interests ordered divested by the order of the Commission has not and will not affect interstate commerce adversely or otherwise. As we have stated, UGI's primary system lies and must lie in the three-state area. Within this area it conducts actual operations in interstate commerce for its subsidiaries distribute electricity and gas across state lines. But UGI also possesses interests in utility and non-utility companies outside of the three-state area, viz., in Connecticut, New Jersey, New Hampshire, Arizona, Tennessee and other states. It operates these outlying companies and businesses in large part from its main office in

---

[14] See Webster's New International Dictionary, Second Edition.

[15] This, in part, declares it to be the policy of the Act "* * * in accordance with which policy all the provisions of [the Act] shall be interpreted, to meet the problems and eliminate the evils as enumerated in [Section 1], connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce; * * *".

1020

Philadelphia. Its representatives traveling from Philadelphia make inspection trips, render advice and assistance, receive weekly and monthly reports, use the mails and the long distance telephone to convey orders and suggestions, and in general control the policies and operations of the subsidiaries. These services are clearly interstate in nature, and the ordinary interstate facilities of transportation and communication are employed in performing them. Using The Arizona Power Corporation and other subsidiary companies of Commonwealth Utilities Corporation as examples, the record shows the nature and extent of these services and that they are rendered in interstate commerce.[16] Such interstate activities properly are subject to regulation by Congress under the Commerce Clause. See International Text-Book Company v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.,N.S., 493, 18 Ann.Cas. 1103; International Text-Book Company v. Lynch, 218 U.S. 664, 31 S.Ct. 225, 54 L.Ed. 1201; Associated Press v. National Labor Relations Board, 301 U.S. 103, 128, 129, 57 S.Ct. 650, 81 L.Ed. 953, and the authorities cited therein, and Electric Bond & S. Co. v. Securities and Exchange Comm., 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

In Section 1(a) of the Act Congress expressly has found that public utility holding companies and their subsidiary companies are affected with a national public interest in that " * * * their service, sales, construction, and other contracts and arrangements are often made and performed by means of the mails and instrumentalities of interstate commerce * * *". This is true in regard to UGI and its subsidiaries and affiliates. The efficient functioning of a system which concededly is in interstate commerce (in this instance UGI's three-state system) must be affected by the necessity of the persons operating that system being required to spend time and energy in supervising outside properties.

The language of the Act against which UGI's activities must be tested, viz., the words of Section 1(a) (4), is broad. The word "affect" is employed. By Section 1 Congress has found that holding company systems in the United States require integration into single systems. UGI contends that it was necessary for the Commission to have received evidence to prove and to have made findings that UGI's operations do in fact materially affect interstate commerce. Congress has already made that finding. UGI is within the terms of the Act and Congress has found that such activities as UGI engages in do materially affect interstate commerce. This is sufficient.

UGI asserts also that the Commission has no power to order the divestment of "non-utility operated businesses"[17] except on certain findings made by the Commission, which, it asserts have not been made. It contends further that the Commission has failed to find the basic facts necessary to support the ultimate facts stated in its findings and opinions and has failed to make the ultimate findings of fact necessary to support the orders entered. These contentions may be considered together.

The Commission has found that UGI's interest in companies which are not statutory public utility companies are not reasonably incidental, economically necessary or appropriate to the operations of any integrated public utility system allowable to UGI.[18] UGI says that this is not enough. UGI's argument is based upon the last sentence of Section 11(b) (1), commonly known as the "Minton Amendment", and upon Section 1(c), 15 U.S.C.A. § 79a(c) which provides, in part, that it shall be the policy of the Act " * * * to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems, and to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided * * *". UGI takes the position that before an order of divestiture may be entered in respect to businesses other than statutory public utilities there must be a finding by the Commission that the retention of the businesses ordered divested is not necessary or appropriate to the public interest or for the protection of investors or consumers or is detrimental to the proper functioning of the integrated system or systems. UGI contends that it was the intention of Congress to eliminate from a holding company system only those businesses, non-statutory utility properties or other properties, found

---

[16] See pp. 638a–658a.

[17] All of the companies named in the order of July 30, 1941 are such businesses.

[18] See pp. 93a–94a; 176a–177a.

affirmatively by the Commission to be detrimental to the proper functioning of the holding company system in interstate commerce; in other words, if a non-utility property is *not* found by the Commission to be detrimental to the proper functioning of the holding company system then the Commission has no power to compel its divestiture. The Commission made no findings that the retention by UGI of its interests in the three companies would be detrimental to the proper functioning of any integrated system to which UGI might be entitled.

■ The Minton Amendment permits the retention of businesses other than statutory public utilities if they meet the requirements of the Act. We think that the word "may" occurring as the third word of the amendment must be construed as "shall". The Commission in applying this part of the statute to UGI has taken the position that it must find *affirmatively* that the businesses sought to be retained are necessary or appropriate in the public interest or for the protection of investors or consumers and are not detrimental to the proper functioning of an integrated system or systems, in order that the business or businesses may be retained by the holding company.

■ The legislative history of Section 11(b) (1) shows that Congress intended that if the holding company was to retain other businesses, the burden should be upon the holding company to show that the other businesses met the requirements prescribed by Congress. This is demonstrated by an earlier and unaccepted version of Section 11(b) (1) which was introduced into the House of Representatives. This provided, "The Commission shall not * * * require any company to divest itself of any

interest in or control over * * * persons other than a public-utility company or the utility assets of a public-utility company unless the Commission finds that such interest or control may not be retained consistently with the public interest * * *". Had these provisions become law UGI's position would have been a strong one. They were rejected, however.[19] When the bill emerged from the Conference Committee the committee report stated, "The substitute agreed to, with respect to the question of integrated public-utility systems, provides that the Commission shall * * * require each holding-company system to be limited to a single integrated public-utility system and to such other businesses as are reasonably incidental or economically necessary or appropriate to the operation of such integrated system *but includes an exception.* * * * The Commission is given express authority to permit as reasonably incidental or economically necessary or appropriate to the operations of an integrated system the retention of any business, other than a public utility as such, which the Commission *finds necessary* or *appropriate* in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of the system."[20]

■ We have emphasized the words which we consider to be of particular importance in the quotation. The Minton Amendment serves to define what "other businesses" designated in the first sentence of Section 11(b) (1) are reasonably incidental, or economically necessary or appropriate to the operations of the integrated system. The standard is plain. We conclude that unless the Commission finds affirmatively that the other businesses which the utility holding company seeks to retain

[19] See S. 2796, Section 11(b), referred to in H.R. Rep. No. 1318, 74th Cong., 1st Sess. (1935); p. 17.

In reference to this bill Senator Wheeler said: "Section 11 of the House bill not only does not require utility holding companies to get out of the myriad of speculative non-utility ventures in which they have been promiscuously active in the past but it specifically hampers the Commission in dealing with these non-utility activities, the House section shifts the entire burden to an administrative Commission, and then makes it impossible for the Commission to do anything about cleaning up the situation." See p. 10,847, 79th Cong. Rec. 1935.

See, also, H.R. Rep. No. 1318, supra, Additional Views of Congressman Eicher, pp. 47-8, and Senator Wheeler's comments, 79 Cong.Rec. 10,838, 14,479-80 (1935).

The Commission itself, through Chairman Kennedy, also objected to the House version on the ground that it furnished no effective standard to guide the Commission while failing to guard that grant "with precise and defined standards set up by the Congress itself." See letter from Chairman Kennedy to Senator Wheeler, 79 Cong.Rec. 10,838 (1935).

[20] See H.R. Rep. No. 1903, 74th Cong., 1st Sess. (1935), pp. 68-70.

meet the requirements of the amendment, they are subject to divestiture. The burden is upon the holding company to show that the businesses sought to be retained fall within the accepted categories. If the holding company fails to do this, such businesses must be divested when so ordered by the Commission. UGI has had full opportunity to make its proof in this respect. It has not done so. As to the effect of the provisions of Section 1(c), these, of course, constitute simply a declaration of policy and are not regulatory. It follows that UGI's contentions must fall.

■ The petitioner also takes the position that the Commission was without authority to compel divestiture under Section 11(b) (1) until it had completed the studies and investigations required by Section 30 of the Act, 15 U.S.C.A. § 79z—4. This contention was passed upon by the Circuit Court of Appeals for the Second Circuit in North American Co. v. Securities and Exchange Commission, 2 Cir., 133 F.2d 148, 151. What was so excellently said in that case by Judge Swan need not be repeated here. Section 30 is an administrative direction by Congress to the Commission, but the completion of the duties imposed on the Commission by Section 30 may not be considered as a condition precedent to a divestiture order under Section 11(b) (1).

■ Last, UGI contends that the orders of the Commission complained of are in violation of the provisions of the Constitution of the United States; (1) because Section 11(b) (1) is invalid as an unconstitutional delegation of legislative powers; (2) because there is nothing in the retention by UGI of the interest ordered divested which affects either adversely or otherwise, any interstate commerce and the Commission therefore had no power under the Constitution to enter the orders complained of, and (3) because the orders are allegedly in violation of the due process clause.

With one exception the same arguments which UGI makes to us in the case at bar were made by Commonwealth and Southern Corporation[21] to this court in respect to orders entered by the Commission directing Commonwealth and Southern Corporation to change its capitalization to one class of stock in an appropriate manner under Section 11(b) (2) of the Act, 15 U.S.C.A. § 79k(b) (2). The differences between the argument of Commonwealth and Southern Corporation and that of UGI are measured only by the difference in wording of subparagraph (1) as contrasted with the wording of subparagraph (2). It is not necessary to repeat in this opinion what was said in that case. Judge Swan, in delivering the opinion of the Circuit Court of Appeals for the Second Circuit in the North American Co. case, supra, 133 F.2d at page 154, passed upon contentions very similar to those made by the petitioner in the case at bar and found the provisions of Section 11(b) (1) to be constitutional and not violative of the Fifth Amendment.

The only other constitutional point raised by UGI rises upon its assertion that the retention of the interests ordered divested will not affect commerce adversely or otherwise. This is a repetition of the argument which we dealt with at an earlier point in this opinion. It need not be discussed again.

In our opinion the orders complained of are valid and were duly made by the Commission in the exercise of the authority constitutionally granted by Congress under the Act. Accordingly they are affirmed.

■ UGI has filed a motion to strike from a "Summary of Economic Data", filed as a supplement to the Commission's brief, certain items for reasons stated in the motion. Briefs are not part of the record; neither are supplements to briefs. Accordingly the motion is denied. See Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 237.

---

[21] See Commonwealth & Southern Corporation v. Securities and Exchange Comm., 3 Cir.. 134 F.2d 747, 752, 754.